Craig T. KOLB and Laura
S. Kolb, Respondents,

v.

DEVILLE I PROPERTIES,
LLC, Appellant.

No. WD 72305.

Missouri Court of Appeals,
Western District.

Dec. 14, 2010.

Jonathan C. Browning, Jefferson City, MO, for Appellant.

Craig Kolb, Jefferson City, MO, pro se.

Laura Kolb, Jefferson City, MO, pro se.

Before MARK D. PFEIFFER, P.J., JAMES EDWARD WELSH, and KAREN KING MITCHELL, JJ.

JAMES EDWARD WELSH, Judge.

DeVille I Properties, LLC, appeals the circuit court's judgment ordering deVille to pay damages to Craig T. and Laura S. Kolb for their claim of breach of implied warranty of habitability due to a bedbug infestation at one of deVille's properties. DeVille contends that the circuit court erred in determining that deVille breached the implied warranty of habitability, in ruling against deVille on its counterclaim for damages against the Kolbs, and in ruling that deVille was not entitled to recover its attorney's fees and court costs from the Kolbs. We affirm.

The evidence established that deVille is the owner and landlord of an apartment complex located in Jefferson City, Missouri. The Kolbs were remodeling their home in Jefferson City, and, due to allergy concerns on the part of Mrs. Kolb and their daughter, the Kolbs decided to rent an unfurnished apartment from deVille for the term of December 2, 2008, through February 28, 2009. Only Mrs. Kolb and her daughter planned to stay in the apartment, as Mr. Kolb continued to live at their home during the renovation. Needing only a temporary place to stay during the renovation, Mrs. Kolb and her daughter moved very few possessions into the apartment, and they slept on air mattresses.

Within a week of their moving into the apartment, Mrs. Kolb and her daughter began noticing red welts on their bodies. They also noticed spots of blood on their sheets and pillow cases. The welts increased in number over the next several weeks. By late December, the condition had progressed to the point that Mrs. Kolb made two trips to an after-hours urgent care facility, where she was treated with steroids and allergy medication.

Mrs. Kolb then visited her allergist, who treated her with medication. When the allergist could not figure out the cause of the welts, he recommended that Mrs. Kolb and her daughter see a dermatologist. Thereafter, Mrs. Kolb and her daughter went to a dermatologist, who took a biopsy of their welts. The dermatologist notified them on February 9, 2009, that the welts were caused by bug bites and advised them to contact the deVille management immediately to remedy the situation.

Mrs. Kolb and her daughter met with an employee of deVille and alerted deVille of their concerns on February 9, 2009. Mrs. Kolb and her daughter told the employee that they had "seen some bugs that were brown and looked like lady bugs, brown lady bugs." Mrs. Kolb said that her daughter thought that they were bedbugs. So, the employee, Mrs. Kolb, and Mrs. Kolb's daughter searched the internet and reached the conclusion that the bugs Mrs. Kolb was talking about were bedbugs. During this meeting and in the presence of Mrs. Kolb and her daughter, the employee contacted the pest control company that deVille uses to spray and treat the interior and exterior of its apartment buildings.

Bias Pest Control made arrangements to treat the property on February 10, 2009. Paul Plunkett, an employee of Bias Pest Control, inspected the Kolbs' apartment and did not find any evidence of bugs. Despite not finding any evidence of bedbugs, Plunkett sprayed the unit with two different chemicals designed to eliminate bedbugs as well as other bugs. Plunkett said that it takes between two to four sprayings to kill bedbugs but that he never was called back by deVille to spray the apartment again. Plunkett also said that he cannot state with "100 percent" certainty that there were no bedbugs in the apartment. He said that, just because he did not see any bedbugs, it "doesn't mean they are not there." According to

Plunkett, bedbugs can hide, and he would not be able to find them.

After receiving this information, deVille sent a letter to the Kolbs stating an exterminator had serviced the apartment for insects and that "[w]hen they serviced the apartment they did not find any evidence of insects." The letter recommended that the Kolbs inspect their permanent residence for possible insects, suggesting that the Kolbs should look elsewhere for the source of the bites.

On February 2, 2009, prior to any communications with deVille regarding the bedbug issue, the Kolbs provided notice that they were vacating their apartment. Because deVille did not receive the Kolbs' notice before February 1, 2009, deVille sent a letter to the Kolbs on February 3, 2009, advising them that they would owe rent through March 31, 2009. The Kolbs, however, refused to pay any additional rent.

After informing deVille about the bites and the bedbugs on February 9th, Mrs. Kolb and her daughter never stayed at the apartment again. The Kolbs fully vacated the unit near the end of February 2009 and demanded that deVille reimburse them for various damages, including the rent that they had paid during their tenancy and their security deposit. DeVille rejected these demands, and the Kolbs initiated a small claims court action in the Small Claims Court Division of the Cole County Circuit Court. In response to this small claims court petition, deVille filed its counterclaim against the Kolbs for unpaid rent and other damages. In its counterclaim, deVille alleged that the Kolbs had failed to properly terminate their lease agreement, which expired on February 28, 2009, and therefore owed rent for the month of March 2009. DeVille further claimed that the Kolbs breached the lease agreement by not returning the property in a good and clean condition and by failing to pay for water service to the unit.

The Small Claims Division held a trial and ruled that the Kolbs were entitled to recover the rent paid for December, January, and February and that the Kolbs did not owe rent for March. The Small Claims Division also found that the Kolbs were liable for $35.00 for cleaning of the apartment and $16.44 for a water bill.

After receiving a copy of the judgment, deVille filed its Application for Trial De Novo with the circuit court. After a trial, the circuit court found that deVille had breached the implied warranty of habitability and entered its judgment in favor of the Kolbs and against deVille in the amount of $1,218. The circuit court ruled that deVille must return the $200 security deposit to the Kolbs but that deVille could offset $16.44 that the Kolbs owed for past due utilities. DeVille appeals.[1]

■■■ Review of this court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the judgment of the circuit court unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* We view the evidence and inferences in the light most favorable to the circuit court's judgment and disregard all contrary evidence and inferences. *Essex Contracting, Inc. v. Jefferson Cnty.*, 277 S.W.3d 647, 652 (Mo. banc 2009). We defer to the circuit court's resolution of

1. With the Kolbs' permission, the Kolbs' attorney filed a motion to withdraw, which this court granted. In a letter received by this court, the Kolbs said that they chose for fi-
nancial reasons not to continue with the case. Thus, the Kolbs did not file a brief or participate in oral arguments in this case.

factual issues, as it was in a better position to judge the witnesses' credibility. *Id.*

In its first point on appeal, deVille contends that the circuit court erroneously declared or applied the law in determining that deVille breached the implied warranty of habitability. In particular, deVille argues that sufficient and uncontradicted evidence established that: (1) the Kolbs did not alert deVille to any problems with the property for approximately two months; (2) deVille took immediate action to remedy the bedbug infestation upon receiving notice; and (3) the Kolbs did not present any evidence showing that they were fully excused from paying any rent to deVille during their tenancy.

■■■ " '[A] landlord impliedly warrants the habitability of leased residential property.' " *Moser v. Cline,* 214 S.W.3d 390, 394 (Mo.App.2007) (quoting *Detling v. Edelbrock,* 671 S.W.2d 265, 270 (Mo. banc 1984), *abrogated on other grounds by Green v. City of St. Louis,* 870 S.W.2d 794 (Mo. banc 1994)). As this court noted in *Moser,* the landlord agrees to provide facilities and services that are "vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes." 214 S.W.3d at 394. To succeed on a claim for the breach of the implied warranty of habitability, the tenant must prove that the condition of the premises was of such a nature as to render the premises "unsafe or unsanitary." *Id.* " 'The materiality of a breach of warranty claimed by a tenant shall be determined by factors, among others, of the nature of the deficiency or defect, its effect on the life, health or safety of the tenant, length of time it has persisted and the age of the structure.' " *Id.* (quoting *King v. Moorehead,* 495 S.W.2d 65, 76 (Mo.App.1973)). A breach of implied warranty must be more than a *de minimis* violation or minor housing code violation. *King,* 495 S.W.2d

at 76. To prevail on a claim for a breach of the implied warranty of habitability, the Kolbs had the burden of proving: (1) they entered into a lease agreement for residential property; (2) subsequent development of dangerous/unsanitary conditions at the premises that materially impact their life, health, and safety of the tenant; (3) reasonable notice of the conditions to deVille; and (4) the failure on the part of deVille to restore the premises to a habitable condition. *Moser,* 214 S.W.3d at 395; *Detling,* 671 S.W.2d at 270. DeVille asserts that the Kolbs failed to prove the necessary elements of reasonable notice of the conditions and failure on the part of the landlord to restore the premise to a habitable condition. We disagree.

■■■ Although deVille argues that the Kolbs failed to give reasonable notice of the conditions, in the argument portion of deVille's brief, it merely states that the Kolbs did not bring deVille's attention to the bedbug problem until almost the end of their tenancy. DeVille offered no further argument or citation of authority to support its contention. "We deem points not developed in the argument section to be abandoned." *Mortg. Elec. Regis. Sys., Inc. v. Williams–Pelton,* 196 S.W.3d 50, 52 (Mo.App.2005). Moreover, the evidence established that once Mrs. Kolb and her daughter became aware that bug bites were the cause of the red welts on their bodies, they contacted deVille immediately. The Kolbs, therefore, gave deVille reasonable notice of the bedbug problem.

■■■ As to the whether or not deVille failed to restore the premises to a habitable condition, the evidence established that Paul Plunkett, an employee of Bias Pest Control, inspected the Kolbs' apartment and did not find any evidence of bugs. Despite not finding any evidence of bedbugs, Plunkett sprayed the unit with two different chemicals designed to elimi-

nate bedbugs as well as other bugs. Plunkett said, however, that it takes between two to four sprayings to kill bedbugs. He noted that deVille never called him back to spray the apartment again. Plunkett also said that he could not state with "100 percent" certainty that there were no bedbugs in the apartment. He said that, just because he did not see any bedbugs, it did not mean that they were not there. According to Plunkett, bedbugs can hide, and he would not be able to find them.

After receiving the information from Plunkett that he did not find any evidence of bedbugs, deVille merely sent a letter to the Kolbs stating that an exterminator had serviced the apartment for insects and that "[w]hen they serviced the apartment they did not find any evidence of insects." The letter recommended that the Kolbs inspect their permanent residence for possible insects, suggesting that the Kolbs should look elsewhere for the source of the bites. Thus, deVille's response to the bedbug complaint was that, based on Plunkett's inspection of the property, deVille did not believe that there were any bedbugs in the apartment and there was no need for deVille to do anything further.

The fact that Plunkett did not see any bedbugs and that he sprayed the apartment once with chemicals designed to kill bedbugs does not establish that the premises were returned to a habitable condition. Indeed, Plunkett even said that it takes between two to four sprayings to kill bedbugs. DeVille, however, had no intention of correcting the bedbug problem as evidenced by its not ordering repeated sprayings of the apartment. DeVille did not order additional sprayings because the letter deVille sent to the Kolbs establishes that deVille did not believe that the apartment had bedbugs. The evidence in this case was sufficient to establish that deVille failed to restore the premises to a habitable condition.

DeVille makes much of the fact that it offered evidence that the tenants residing in the apartment immediately prior to and immediately after the Kolbs did not have any problems with bedbugs. The circuit court, however, found that this evidence had little relevance, if any, to the issue of whether there were bedbugs in the apartment between December 2008 and February 2009. The circuit court concluded:

> [E]ven if the fact that the new tenants did not complain of bedbugs when they moved in after the Kolbs in mid-April can be taken as evidence that there were no bedbugs—which is highly speculative as there are many reasons why a tenant might not raise even a valid complaint—more than a month had passed between February 9th (when Mrs. Kolb and her daughter stopped sleeping in the apartment) and mid-April (when the new tenants moved in). Deprived of any "food source" for five weeks, the bugs either could have died or moved on in search of food.

We agree. That other tenants did not complain about bedbugs in the apartment does not establish that the apartment was uninhabitable because of bedbugs during the time that the Kolbs rented the apartment.

■ DeVille also asserts that the Kolbs' claim for breach of implied warranty of habitability must fail because the Kolbs did not present any evidence showing that they were fully excused from paying any rent to deVille during their tenancy. DeVille claims that the circuit court erred in allowing the Kolbs to recover all the rent that they paid while residing in the apartment.

■ Generally, in a breach of implied warranty of habitability case, a "tenant's

damages are reasonably measured by the difference between the agreed rent and the fair rental value of the premises as they were during occupancy by the tenant in the unhealthful or unsafe condition." *King*, 495 S.W.2d at 76. Where the tenant vacates the premises, the measure of damages is "the value of the lease for the unexpired term, that is, the then difference between the fair rental value of the premises if they had been as warranted and the promised rent, computed for that period." *Id.* The agreed rent in this case was $405 per month. The circuit court found that the apartment with the bedbug infestation had no value. The circuit court, therefore, found that the Kolbs were entitled to damages in the amount of 100 percent of the rent that they actually paid. We agree. Mrs. Kolb testified as to the lack of habitability of the apartment due to the bedbugs. Thus, the damages in this case correctly represent the difference between $405 (the agreed rent) and $0 (the fair rental value of the premises with a bedbug infestation).

We, therefore, conclude that the circuit court did not erroneously declare or apply the law in determining that deVille breached the implied warranty of habitability and that the Kolbs were entitled to recover all the rent that they paid while residing in the apartment. Point I is denied.

In its second point, deVille asserts that the circuit court erred in ruling against deVille on its counterclaim for damages against the Kolbs for their failure to give timely notice of their intent to vacate. DeVille claims that, because the Kolbs failed to properly terminate their lease agreement, which expired on February 28, 2009, they owed rent for the month of March 2009.

Tenants, however, may use a breach of implied warranty of habitability as a defense to a landlord's action for rent. *Moser*, 214 S.W.3d at 394; *Detling*, 671 S.W.2d at 270. The circuit court found

that deVille's breach of the implied warranty of habitability and the Kolbs' moving out and the resulting termination relieved them of liability for March's rent. We agree with the circuit court that, because deVille failed to restore the premises to a habitable condition, the Kolbs' notifying deVille of the conditions and their moving out of the apartment at the end of their lease term effectively terminated their obligations under the lease.

DeVille further claims that the Kolbs breached the lease agreement by not returning the property in a good and clean condition. The circuit court found that deVille was "not entitled to recover for cleaning, carpet shampooing or other end-of-lease expenses" as the lease was terminated by the Kolbs for deVille's breach of the implied warranty of habitability. We agree with the circuit court that, because the premises were uninhabitable due to the bedbug infestation, deVille was not entitled to payment for cleaning of the apartment. Point II is denied.

Finally, to the extent that deVille contends that it is entitled to its attorney's fees because it proved its damages for unpaid rent and damages under the terms of the lease, its contention is without merit given our denials of deVille's first and second points on appeal. As deVille is not a prevailing party in this action, it is not entitled to attorney's fees. DeVille also filed a motion for attorney's fees on appeal with this court. We also deny that motion.

We, therefore, affirm the circuit court's judgment ordering deVille to pay damages to Craig T. and Laura S. Kolb for their claim of breach of implied warranty of habitability.

All concur.