Angela T. Quigless, J.
5 G Homes, LLC ("Appellant") appeals from the judgment of the Circuit Court of Cape Girardeau County, finding in favor of Kasey L. Tolliver ("Ms. Tolliver") on her claim for breach of implied warranty of habitability. On appeal, Appellant contends the circuit court erred in entering judgment in favor of Ms. Tolliver because her claim is barred by the exculpatory clause *829 in the June 1, 2017 residential lease agreement. Appellant also contends the circuit court erred in ruling against it on its counterclaim for breach of contract and finding Appellant was not entitled to damages for unpaid rent. Finding no error, we affirm.
Factual and Procedural History
In May 2016, Ms. Tolliver and her roommate signed a one-year residential lease for the basement apartment of a property located in Cape Girardeau, Missouri. At this time, Appellant did not own the property and was not a party to the lease agreement. In the spring of 2017, during the lease term, Appellant, a property investment firm, purchased the property from the prior owner and, as a result, became Ms. Tolliver's new landlord. It is undisputed that the 2016 lease remained in full force and effect despite the change in landlords. On March 25, 2017, Ms. Tolliver and her roommate renewed their one-year lease with Appellant for the term of June 1, 2017, through May 31, 2018 ("2017 lease"). At trial, the parties agreed the renewed 2017 lease did not go into effect until June 1.
On April 10, 2017,[1] Ms. Tolliver contacted Appellant about a water leak in her room, which was causing surface mold and mildew to grow. Appellant sent a maintenance man who put sealant on the exterior wall of the property where he thought the water was leaking into the apartment. A dehumidifier was also placed inside the apartment to remove moisture. On April 23, Ms. Tolliver again contacted Appellant, complaining that she was suffering from allergy problems because mold and mildew were still in the apartment. Three days later, Ms. Tolliver informed Appellant that water was leaking through cracks in the wall of her laundry room, and mold was beginning to grow.
Frustrated, Ms. Tolliver subsequently contacted the City Inspector who provided an inspection of the property. In his report, dated April 28, the City Inspector noted that one of the bathrooms was very humid, which was causing mold to grow behind the toilet and on the shower floor. Additionally, the drywall at the rear entrance was waterlogged, and the carpet and pad in several of the bedrooms were saturated with water, causing mold to grow in these areas. The City Inspector advised Appellant to remove all sections of waterlogged drywall and replace it with material that would not absorb water. Appellant also was advised to remove water-saturated carpet and pad, and clean existing carpet or replace it with a nonabsorbent flooring material. The City Inspector advised Ms. Tolliver to run an exhaust fan or dehumidifier to remove humidity and prevent mold growth.
In early May, Ms. Tolliver had to move everything out of the bedrooms so a construction crew could begin replacing the carpet. Ms. Tolliver asked Appellant on two occasions to pay for a hotel room during the on-going construction because she and her roommate were suffering from allergies. However, Appellant declined and instead offered to reduce June's rent by half. On May 9, Ms. Tolliver informed Appellant that she and her roommate had decided not to renew their lease, and would vacate the apartment by June 15. Construction continued in the apartment through the month of May. On June 8, the City Inspector gave a follow-up inspection of the apartment. While Appellant had fixed most of the issues, the City Inspector *830 noted some surface mold was still growing on the bathroom wall behind the toilet and on the shower floor, and a small section of waterlogged drywall behind the rear foyer doors still needed to be replaced.
On June 15, Ms. Tolliver and her roommate vacated the apartment. Ms. Tolliver did not pay full or partial rent for the month of June. Appellant subsequently terminated the 2017 lease and did not return the security deposit.
Thereafter, Ms. Tolliver filed a petition in small claims court, alleging damages due to a breach of the implied warranty of habitability in the amount of $5,000.[2] Ms. Tolliver asserted, in part, that items of her personal property were damaged by the water leakage and mold in the apartment. Following a hearing, the court entered a judgment in favor of Ms. Tolliver, awarding her $2,141 in damages. Appellant subsequently filed an application for trial de novo with the circuit court. Appellant filed a motion to dismiss Ms. Tolliver's petition or, in the alternative, motion for more definite statement. The circuit court denied the motion. Appellant then filed an answer, affirmative defenses, and counterclaim. As an affirmative defense, Appellant argued the 2017 lease "contained an explicit and specific liability waiver ... that states Defendant is not liable for any damages incurred by Plaintiff relating to the conditions alleged in Plaintiff's petition." Appellant stated Ms. Tolliver initialed the waiver, and it "was in full force and effect at the time of the events complained of in Plaintiff's petition," which is a complete defense to Ms. Tolliver's claim for breach of implied warranty of habitability. Appellant also asserted a counterclaim for breach of contract, alleging Appellant failed to pay rent for June as obligated under the 2017 lease.
At trial, Ms. Tolliver appeared pro se , and Appellant appeared by counsel and its property manager. Ms. Tolliver and the property manager gave varying accounts of the above-stated events. Additionally, Ms. Tolliver testified that numerous items of her personal property were damaged by the water leakage and mold in the apartment. Ms. Tolliver offered into evidence a list of the damaged items and their values.[3] She also claimed damages for a medical bill, food costs, rent for May 2017, her security deposit, and emotional distress.
Following trial, the circuit court entered its findings of fact, conclusions of law, and judgment, finding in favor of Ms. Tolliver on her claim for breach of implied warranty of habitability. The circuit court found Ms. Tolliver offered evidence that the defects in the apartment were material, and that Appellant failed to correct them within a reasonable time to prevent her damages. The court found Ms. Tolliver suffered damage to her personal property, which "resulted from the negligence, inactions, or actions" of Appellant. The circuit court also found that although the 2017 lease was a valid and enforceable contract, and Ms. Tolliver acknowledged she failed to pay June's rent as required, Ms. Tolliver's testimony established Appellant agreed to waive rent for June. Accordingly, the circuit court ordered Appellant to *831 pay Ms. Tolliver damages in the amount of $2,240.[4] This appeal follows.
Points on Appeal
Appellant raises two points on appeal. In Point I, Appellant argues the circuit court erred in entering judgment in favor of Ms. Tolliver on her claim for breach of implied warranty of habitability because the claim is barred by the exculpatory clause in the 2017 lease. In Point II, Appellant argues the circuit court erred in entering judgment against it on its counterclaim because Appellant proffered evidence to support a prima facie breach of contract claim.
Standard of Review
Our standard of review in a court-tried case is governed by Murphy v. Carron , 536 S.W.2d 30 (Mo. banc 1976). Easley v. Gray Wolf Invs., LLC , 340 S.W.3d 269, 272 (Mo. App. E.D. 2011). We will affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. Id. We view the evidence and inferences in the light most favorable to the circuit court's judgment, and disregard all contrary evidence and inferences. Essex Contracting, Inc. v. Jefferson Cty. , 277 S.W.3d 647, 652 (Mo. banc 2009). We defer to the trial court's resolution of factual issues and witness credibility determinations. Woods of Somerset, LLC v. Developers Surety & Indem. Co. , 422 S.W.3d 330, 334 (Mo. App. W.D. 2013). Additionally, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c); Ivie v. Smith , 439 S.W.3d 189, 200 (Mo. banc 2014).
Discussion
Point I-The Exculpatory Clause
In Point I, Appellant argues the circuit court erred in entering judgment in favor of Ms. Tolliver on her claim for breach of implied warranty of habitability because the claim is barred by the exculpatory clause in the 2017 lease. The exculpatory clause provided:
[T]he Landlord shall not be liable to the Tenant or the Tenant's agents, guests, roomers, or employees for any damage to them or their persons or property, by theft or burglary, water, rain, snow, ice, sleet, fire, mold , explosion, frost, storms, and accidents, or by breakage, stoppage, or leakage of water , gas, heating and sewer pipes, electric wiring or current, or plumbing upon, about or adjacent to the premises, nor for any negligence of others that may cause damage of any character whatsoever.
(emphasis added). On appeal, Appellant contends Ms. Tolliver read and signed the 2017 lease, which contained this clause, and, therefore, she expressly released Appellant from liability for damage to her personal property caused by water leakage or mold. We disagree.
We find the 2017 lease, and the exculpatory clause contained therein, is immaterial to resolving Appellant's claim because sufficient evidence was presented that Ms. Tolliver's damages occurred prior to June 1, 2017, when the original 2016 lease was still in full force and effect. See Emery Bird Thayer Dry Goods Co. v. J. C. Nichols Co. , 427 S.W.2d 492, 494 (Mo. banc 1968) (finding the trial court properly struck from defendant's answer any reference to a 1960 lease because the lease had not become effective at the time of the *832 alleged loss and was immaterial to any issue in the case). The evidence presented at trial established Ms. Tolliver entered into the original lease in May 2016 for a one-year term. Ms. Tolliver first contacted Appellant on April 10 regarding a water leak in her room, which was causing mold and mildew to grow. On April 23, Ms. Tolliver told Appellant that mold and mildew was still present in the apartment, and she was suffering from allergy problems. Three days later, Ms. Tolliver informed Appellant that water was leaking through cracks in the wall of her laundry room, and mold was beginning to grow. Ms. Tolliver contacted the City Inspector, and his report, dated April 28, noted that one of the bathrooms was very humid, drywall at the rear entrance was waterlogged, and the carpet and pad in several of the bedrooms were saturated with water. The report indicated that mold was growing in each of these areas. Throughout the month of May, a construction crew was repairing the issues in the apartment. By June 8, the City Inspector noted most of the issues were fixed with the exception of some surface mold in the bathroom and a small section of waterlogged drywall behind the rear foyer doors. Ms. Tolliver moved out on June 15.
Appellant argues it is unclear which lease was in effect when the damage occurred because Ms. Tolliver remained in the apartment until June 15 and did not present any evidence of the exact date her property was damaged. While we acknowledge Appellant's argument, our standard of review requires this Court to view the evidence and all reasonable inferences in the light most favorable to the circuit court's judgment. See Essex Contracting, Inc. , 277 S.W.3d at 652. In this case, all of the water leakage, complaints of mold and mildew, and construction occurred prior to the June 1 lease agreement. The City Inspector's report, dated April 28, noted mold in one of the bathrooms, waterlogged drywall, and saturated carpet in several bedrooms. Additionally, Ms. Tolliver's small claims petition alleged her claim arose "on or about April 10, 2017" as a result of, among other things, "damaged items." By June 8, just after the 2017 lease took effect, a majority of the issues were repaired aside from some mold in the bathroom and a small section of drywall that needed to be replaced behind the rear doors. Accordingly, there was sufficient evidence to reasonably infer the damage to Ms. Tolliver's property occurred before the 2017 lease became effective.
Although we find the 2016 lease is controlling in this case, Appellant argues that, under Missouri precedent, the exculpatory clause in the 2017 lease is effective in releasing it from liability for events that occurred earlier that year, when the 2016 lease was in effect. In support of its argument, Appellant relies on Alack v. Vic Tanny Int'l of Mo., Inc. , 923 S.W.2d 330 (Mo. banc 1996). In that case, Alack brought a negligence suit against Vic Tanny, a health club facility, after Alack was injured while using a workout machine. Id. at 332. During trial, Vic Tanny questioned Alack about the general exculpatory clause contained in the membership contract, which purported to release Vic Tanny from "any and all claims" against it. However, Alack testified he did not understand the language in the clause to mean he was releasing Vic Tanny from its own future negligence. Id. at 333. Nonetheless, Vic Tanny argued it was entitled to a directed verdict because the exculpatory clause barred Alack's negligence claim as a matter of law. Id. at 334. The trial court decided to submit the issue to the jury. The jury returned a verdict in favor of Alack. Id.
On appeal, the Missouri Supreme Court addressed the enforceability of exculpatory *833 clauses in contracts. The Court found that such clauses must contain "clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence. The exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence." Id. at 337. The Court established a bright-line test, easy for courts to apply: "The words 'negligence' or 'fault' or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs. There must be no doubt that a reasonable person agreeing to an exculpatory clause actually understands what future claims he or she is waiving." Id. at 337-38. Based on the language of the exculpatory clause at issue, the Court concluded Vic Tanny was not entitled to a directed verdict because the clause was ambiguous and did not meet the requirements of the bright-line test. Id. at 338.
We find Appellant misconstrues the Missouri Supreme Court's holding in Alack . Contrary to Appellant's argument, Alack does not stand for the proposition that courts can retroactively apply an exculpatory clause in a contract that was not in effect at the time a party's damages occurred. The Alack Court simply established the requirements of an enforceable exculpatory clause. Appellant does not cite to any other cases to support its argument for retroactive application, and we have found none. Rather, under Missouri law, provisions in a lease (or other contract) that was in effect when a party's damages occurred governs the issues raised, and all other leases-executed prior to or after the controlling lease-are immaterial. See Emery Bird Thayer Dry Goods Co. , 427 S.W.2d at 494. We decline to expand Alack , and disregard Emery Bird , to permit the retroactive application of an exculpatory clause.
Accordingly, we find the circuit court did not err in entering judgment in favor of Ms. Tolliver because her claim is not barred by the exculpatory clause in the 2017 lease. Point I is denied.
Point II-Breach of Contract Claim
In Point II, Appellant argues the circuit court erred in entering judgment against it on its counterclaim because Appellant proffered uncontroverted evidence to support a prima facie breach of contract claim. Specifically, Appellant contends Ms. Tolliver materially breached the 2017 lease by remaining in the apartment until June 15 without paying full or partial rent for June. We disagree.
Tenants may use a breach of implied warranty of habitability as a defense to a landlord's action for rent and possession. Moser v. Cline , 214 S.W.3d 390, 394 (Mo. App. W.D. 2007) ; Kolb v. DeVille I Props., LLC, 326 S.W.3d 896, 903 (Mo. App. W.D. 2010). In Kolb , the Kolbs brought suit against deVille for breach of implied warranty of habitability due to a bedbug infestation in their apartment. Kolb , 326 S.W.3d at 900. In response, deVille filed a counterclaim for unpaid rent, arguing the Kolbs failed to properly terminate their lease agreement and owed an extra month's rent. Id. The circuit court found the Kolbs were relieved of liability for rent because deVille breached the implied warranty of habitability, the Kolbs moved out of the apartment, and the lease was terminated. Id. at 903. The appellate court agreed, concluding that, "because deVille failed to restore the premises to a habitable condition, the Kolbs' notifying deVille of the conditions and their moving out of the apartment at the end of their lease term effectively terminated their obligations under the lease." Id.
Here, as in Kolb , Ms. Tolliver notified Appellant of the water leakage and mold on multiple occasions. The circuit court found Appellant breached the implied warranty *834 of habitability because the defects in the apartment were material, and Appellant failed to correct them within a reasonable time to prevent Ms. Tolliver's damages. Consequently, like in Kolb , Ms. Tolliver vacated the apartment and Appellant terminated the 2017 lease, and, therefore, Ms. Tolliver was relieved of liability for June's rent as well as any other obligations under the lease.
Furthermore, the circuit court specifically found Ms. Tolliver's testimony established that Appellant agreed to waive rent for June. We recognize the circuit court is free to believe or disbelieve all, part, or none of the testimony presented. Watson v. Mense , 298 S.W.3d 521, 525 (Mo. banc 2009). This Court "defers to the trial court on factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." Essex Contracting, Inc. , 277 S.W.3d at 652 (quoting In re Adoption of W.B.L., 681 S.W.2d 452, 455 (Mo. banc 1984) ). We will not substitute our own judgment for that of the circuit court by re-evaluating the credibility of the evidence and witnesses presented at trial. Pearson v. Koster , 367 S.W.3d 36, 56 (Mo. banc 2012).
Accordingly, we find the circuit court did not err in entering judgment against Appellant on its breach of contract claim. Point II is denied.
Conclusion
We affirm the judgment of the circuit court.
Lisa P. Page, C.J., and Timothy W. Inman, Sp.J., concur.

Because the relevant events in this case occurred in 2017, all dates referenced hereafter are to 2017 unless otherwise indicated.

Specifically, the small claims petition alleged:
The plaintiff states [she] has a claim against the defendant in the amount of $5,000. The claim arose on or about April 10, 2017 ... as a result of the following events: failed to keep property habitable, failed to provide housing, return deposit, damaged items, medical bills, lasts month rent (sic) and emotional distress.

The damaged items included a mattress, sheets, pillows, shoes, clothes, bags, hats, and photos.

The circuit court stated the amount of damages did not include amounts for medical bills, emotional distress, food costs, or photos because Ms. Tolliver did not provide any evidence to prove those allegations.